## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **TERRY J. CLARK,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 15-9090-DDC-KGG** |
| **TIME INC. and HEARTLAND GOLF DEVELOPMENT II, LLC,** | |
| **Defendants.** | |

## MEMORANDUM AND ORDER

Hyperbole and the game of golf are not strangers to one another.

After a particularly good round, a golfer might describe his long and accurate drives as "pointing . . . lasers right at the . . . flag all day long."[1]  On another day, after a less successful outing, the same golfer might lament repeated errant shots into bunkers, claiming he spent the day on the beach.  A course with greens running high on the Stimpmeter[2] might lead to

---

[1]     Alan Bastable, *George Brett Boasts About Career Golf Round in Epic Voice Mail*, GOLF.COM (May 27, 2016), http://www.golf.com/extra-spin/george-brett-leaves-hall-fame-golf-voicemail (last visited Mar. 15, 2017).

[2]     A Stimpmeter is a device used to measure the relative speed of golf greens.  In a release announcing the newest version of the Stimpmeter, the United States Golf Association explained how the device works:

> Thirty-six inches long, the Stimpmeter features a lengthwise groove, with a notch about 30 inches from the tapered end.  The ball sits in this notch at the starting position, lying flat on the ground; when the user lifts the other end of the Stimpmeter to an angle of about 22 degrees, gravity releases the ball from the notch.

> The ball rolls down the Stimpmeter and along the green, and the average distance traveled by the ball after a number of attempts is the figure that has come to represent the speed of the green.

complaints about the vagaries of slick greens.  A golfer whose wild tee shots consistently had landed his ball in the trees might say that he spent most of the day in jail.  And, a golfer might describe a poorly maintained course as a goat ranch.

This case arises from the use of hyperbole in an article about a golf course.  On May 29, 2014, defendant Time Inc. published an article on its GOLF.com website that criticized the former General Manager of the Hillcrest Country Club in Kansas City, Missouri, by referring to him as Vlad the Impaler.[3]  Although the article does not mention him by name, plaintiff Terry J. Clark served as Hillcrest's General Manager.  And, the parties stipulate that the article's references to Vlad the Impaler are references to Mr. Clark.

This article gives rise to the claims asserted in this lawsuit.  Plaintiff contends that the article's contents—including the Vlad the Impaler hyperbole—are false statements that have damaged his reputation and emotional wellbeing.  He asserts two claims against defendants Time Inc. and Heartland Golf Development II, LLC ("Heartland Golf").  Both claims arise under Kansas law—one claims defamation and the other claims intentional infliction of emotional distress.  Defendants move for summary judgment against both (Docs. 31, 33).  For reasons explained below, the court grants defendants' motions because the summary judgment facts present no genuine issue warranting a trial on either claim.

---

Hunki Yun, *New Stimpmeter Introduced*, USGA (Jan. 24, 2013), http://www.usga.org/articles/2013/01/usga-introduces-updated-stimpmeter-21474853935.html (last visited Mar. 15, 2017).

[3]     Vlad the Impaler was a nickname of Vlad III Dracula, a 15th century Romanian leader.  *Vlad the Impaler, Ruler of Walachia*, Encyclopaedia Britannica, https://www.britannica.com/biography/Vlad-the-Impaler (last visited Mar. 15, 2017).  This particular Vlad was notorious for impaling his enemies with sharp sticks, placing the sticks into the ground, and leaving his victims there to die.  *Id.*  Vlad's affinity for this particular brand of torture earned him his cognomen.  *Id.*

Before turning to defendants' summary judgment motions, the court first addresses the other pending motions in this case.  Plaintiff has filed two motions to strike (Docs. 58, 59).  They ask the court to strike defendants' summary judgment motions, memoranda, and replies because defendants never served him with a Notice to Pro Se Litigant Who Opposes A Motion For Summary Judgment, as D. Kan. Rule 56.1(f) requires.  The court denies plaintiff's motions for reasons set forth in the first section below.  Defendants respond with three motions to strike of their own (Docs. 50, 52, 53).  They ask the court to strike certain materials that plaintiff has submitted with his responses to defendants' summary judgment motions.  For reasons explained below, in the second section, the court grants in part and denies in part defendants' motions to strike.

## I.      Plaintiff's Motions to Strike

Plaintiff moves to strike defendants' summary judgment motions, memoranda in support, and replies because, he asserts, defendants never served him with a Notice to Pro Se Litigant Who Opposes A Motion For Summary Judgment ("Pro Se Notice"), and our court's local rules required them to serve such a notice.  D. Kan. Rule 56.1(f) provides:

> Any represented party moving for summary judgment against a party proceeding pro se must serve and file as a separate document, together with the papers in support of the motion, the following "Notice To Pro Se Litigant Who Opposes a Motion For Summary Judgment" with the full texts of Fed. R. Civ. P. 56 and D. Kan. Rule 56.1 attached.

Defendants assert that they did not need to serve plaintiff with the Pro Se Notice because, when they filed their summary judgment motions, plaintiff was represented by counsel.  To understand this argument, some more background information is required.

Plaintiff filed this lawsuit through his chosen counsel on May 28, 2015.  His counsel represented him in the case through defendants' filing of their summary judgment motions on

July 15, 2016.  Our court's local rules required plaintiff to file his responses to defendants'

summary judgment motions within 21 days, or by August 5, 2016.  *See* D. Kan. Rule 6.1(d)

(providing a 21-day response time for responses to dispositive motions).  Plaintiff did not file

any responses on August 5.  Instead, plaintiff filed a "Motion Requesting Permission From the

Court to Remove Plaintiff's Attorney Dan Williams."  Doc. 35.  Plaintiff explained that he and

his attorney disagreed about how to proceed with the case.  *Id.* at 1.  Plaintiff also explained that

he had asked his attorney to withdraw from the case but he hadn't done so.  *Id.*  Plaintiff thus

asked the court to order his attorney's removal from the case.  *Id.*  Plaintiff simultaneously filed a

Motion for Extension of Time seeking an extension until August 22 to respond to defendants'

summary judgment motions.  Docs. 37, 38.

Magistrate Judge Kenneth G. Gale convened a telephone conference with the parties on

August 9, 2016.  During that conference, plaintiff's attorney moved to withdraw, and Judge Gale

granted the motion.  Doc. 41.  Judge Gale also granted plaintiff's motion requesting the removal

of his attorney.  *Id.*  Since then, plaintiff has proceeded pro se.[4]  The court granted plaintiff an

extension until August 22 to file his responses to defendants' summary judgment motions.  Doc.

44.  Plaintiff then timely filed his responses pro se.  Docs. 45, 46.

So, as these facts demonstrate, defendants are correct.  Plaintiff was represented by

counsel when defendants filed their summary judgment motions.  And so, D. Kan. Rule 56.1(f)

did not require them to serve plaintiff with the Pro Se Notice "together with their papers in

support of the motion."

To be sure, after plaintiff's counsel withdrew from the case, plaintiff became a pro se

party opposing summary judgment.  While our rule did not require defendants to serve plaintiff

---

[4]     Because plaintiff now proceeds pro se, the court construes filings he made liberally and holds
them to a less stringent standard than formal pleadings drafted by lawyers.  *See Hall v. Bellmon*, 935 F.2d
1106, 1110 (10th Cir. 1991).

with the Pro Se Notice at that time, defendants might have fostered the rule's purpose—

informing pro se parties about summary judgment procedures—by serving a Pro Se Notice even

though the rule did not require it explicitly.  But, neglecting to do something that our rules did

not require does not warrant the harsh sanction of striking defendants' summary judgment

motions.  This conclusion is especially appropriate here because the record plainly establishes

that plaintiff was not harmed by the absence of the Pro Se Notice.  Indeed, plaintiff specifically

cites D. Kan. Rule 56.1 in one of his responses to defendants' summary judgment motions.  *See*

Doc. 47 at 7 ("Pursuant to Kansas District Court Rule 56.1, Plaintiff Terry J. Clark submits the

following memorandum in response to Defendant Time Inc.'s uncontroverted facts . . . .").  He

also responded to defendant Heartland Golf's explication of the summary judgment standard—

one that included a citation to Fed. R. Civ. P. 56—by stating that he "agrees with the standard."

Doc. 46 at 24.

Plaintiff's responses also complied with the federal and local rules governing summary

judgment.  Plaintiff has responded to each one of defendants' numbered statements of fact,

stating whether he controverts the fact or not.  *See* D. Kan. Rule 56.1(b)(1) (explaining that "[a]

memorandum in opposition to a summary judgment motion must begin with a section containing

a concise statement of material facts as to which the party contends a genuine issue exists").

And, when plaintiff has controverted a proposed fact, he has cited the summary judgment

evidence that, he contends, makes the fact a disputed one, just as our local rule requires.  *See id.*

("Each fact in dispute must be numbered by paragraph, refer with particularity to those portions

of the record upon which the opposing party relies, and, if applicable, state the number of

movant's fact that is disputed."); *see also* Fed. R. Civ. P. 56(c)(1) (requiring a party "asserting

that a fact . . . is genuinely disputed" to support the assertion with "particular parts of material in

the record" or "showing that the materials cited do not establish the absence . . . of a genuine dispute").

Plaintiff also has provided additional statements of fact that, he contends, preclude summary judgment. This submission is precisely what D. Kan. Rule 56.1(b)(2) contemplates. *See* D. Kan. Rule 56.1(b)(2) ("If the party opposing summary judgment relies on any facts not contained in movant's memorandum, that party must set forth each additional fact in a separately numbered paragraph, supported by references to the record . . . ."). And, plaintiff appended summary judgment materials to each of his responses, the approach required by our local rules. *See* D. Kan. Rule 56.1(d) (explaining how to present the factual materials that the opposing party uses to base his opposition). Plaintiff attached 22 separately numbered exhibits to his response to defendant Heartland Golf's summary judgment motion and 14 separately numbered exhibits to his response to defendant Time Inc.'s summary judgment motion. *See* Docs. 46, 47.[5]

On this procedural record, plaintiff cannot credibly complain that any omission of a Pro Se Notice prejudiced his ability to respond to the summary judgment motions. He has followed the appropriate procedures under the rules governing summary judgment. Although the ultimate outcome of the summary judgment motions is an adverse one for plaintiff, the court reaches this decision after considering the merits of his claims. In short, the summary judgments awarded by this order do not result from plaintiff's ignorance of the federal or local summary judgment rules, or his failure to follow them. The court thus denies plaintiff's Motions to Strike defendants' summary judgment motions, memoranda in support, and replies.

---

[5]     Two of the exhibits that plaintiff has submitted with his responses are affidavits. As discussed in the next section, defendants move to strike these affidavits. Defendants object to one affidavit because it contains inadmissible hearsay and object to the other because plaintiff did not disclose the affiant in his Rule 26 disclosures. These objections are substantive ones. Thus, the omission of the Pro Se Notice has no bearing on the admissibility of these affidavits on summary judgment.

## II.     Defendants' Motions to Strike

The court next turns to defendants' Motions to Strike.  Defendants have filed three,
separate motions to strike.  They ask the court to strike certain materials plaintiff has submitted
with his responses to defendants' summary judgment motions.  The court takes up defendants'
requests collectively because many of their arguments overlap.

First, defendants move to strike Debra Taylor's Affidavit (Doc. 46 at 274–76; Doc. 47 at
287–89).  Defendants argue that the court should exclude this Affidavit because plaintiff never
identified Ms. Taylor in his Rule 26 disclosures.  Federal Rule 37(c)(1) provides:  "If a party
fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not
allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a
trial, unless the failure was substantially justified or is harmless."  Fed R. Civ. P. 37(c)(1); *see
also Vesom v. Atchison Hosp. Ass'n*, 279 F. App'x 624, 631 (10th Cir. 2008) ("The exclusion of
evidence presented out of time is automatic and mandatory unless the violation was either
justified or harmless." (citation and internal quotation mark omitted)).  A district court has
discretion to decide whether a Rule 26 violation is justified or harmless and, when doing so,
should consider the following factors:  "(1) the prejudice or surprise to the party against whom
the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which
introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or
willfulness."  *Jacobsen v. Desert Book Co.*, 287 F.3d 936, 953 (10th Cir. 2002) (quoting
*Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999)).

These factors favor exclusion of Ms. Taylor's Affidavit.  First, defendants are prejudiced
and surprised by the Affidavit.  Defendants had no notice that plaintiff would rely on Ms. Taylor
as a witness in this case.  Plaintiff thus has denied defendants any opportunity to discover

information about this witness's testimony, including taking her deposition. The information in the Affidavit also contradicts plaintiff's deposition testimony about Ms. Taylor's involvement in the case. Plaintiff testified that Ms. Taylor had read the article, thought it was ridiculous, and didn't believe it. But her Affidavit states that she had doubts about plaintiff after reading the article in 2014. Second, the ability to cure the prejudice would require reopening discovery proceedings. This influences the third factor—reopening discovery after defendants have moved for summary judgment will disrupt the proceedings. The parties will need additional time to complete the necessary discovery, and defendants will have to revise and resubmit their summary judgment motions. Finally, plaintiff's failure to disclose Ms. Taylor appears willful. Plaintiff testified that he has known Ms. Taylor since kindergarten and that he spoke with her about the article shortly after he learned of it. Ms. Taylor's Affidavit states that she has known plaintiff for many years, she read the article that led to this lawsuit, and she spoke with plaintiff about it. These facts show that plaintiff certainly knew Ms. Taylor, yet he failed to disclose her as a witness. The facts warrant exclusion of Ms. Taylor's Affidavit.

Plaintiff does not address these factors explicitly in his response to defendants' motions. Instead, plaintiff asserts that he could not disclose Ms. Taylor's Affidavit because it "just recently [came] into [his] possession" so he "is simply supplementing discovery requested by Defendants" by attaching the Affidavit to his summary judgment response. Docs. 56 at 1; Doc. 57 at 1. Ms. Taylor signed her Affidavit on August 11, 2016. So, it's likely true that plaintiff came to possess the Affidavit shortly before filing his summary judgment response. But this apparent fact cannot excuse plaintiff's failure to disclose Ms. Taylor as a witness. Plaintiff had access to the substance of Ms. Taylor's Affidavit before he submitted it with his summary judgment response. Plaintiff and Ms. Taylor concede that they have known each other for many

years.  Ms. Taylor's Affidavit states that plaintiff has advised her about business activities since the fall of 2012, and that she hired plaintiff to help her with a business project.  Ms. Taylor asserts "over the last few months," her bank "has been harassing [her] over the fact that [plaintiff] is involved in [the] project."  Doc. 46 at 275; Doc. 47 at 288.  Plaintiff states in his Reply that this issue with the bank "evolved over the last few weeks prior to the Affidavits" and "became very serious" "[o]nly over the last couple of months before production."  Doc. 57 at 4. If, as plaintiff concedes, he knew about Ms. Taylor's issue with the bank months before he produced her Affidavit, he should have supplemented his disclosures to provide information about Ms. Taylor to defendants.  He did not.  His failure justifies exclusion of Ms. Taylor's Affidavit on summary judgment.

Nevertheless, the court declines to exclude Ms. Taylor's Affidavit in its entirety because plaintiff's late disclosure is harmless.  As discussed below, Ms. Taylor's Affidavit presents no genuine issues of fact that a jury must decide.[6]  The court does exclude, however, paragraphs 13 and 14 of Ms. Taylor's Affidavit because they contain inadmissible hearsay statements.

The court cannot consider inadmissible hearsay contained in affidavits on summary judgment because such statements are inadmissible at trial in any form.  *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006); *see also Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) ("Hearsay testimony that would be inadmissible at trial cannot be used to defeat a motion for summary judgment").  Here, the Affidavit describes conversations that Ms. Taylor says she had with a banker about plaintiff. And, plaintiff offers these statements to prove damage to his reputation.  The statements thus are "out-of-court written statement[s] . . . now offered to prove the truth of the matter asserted." *Brown v. Perez*, 835 F.3d 1223, 1232 (10th Cir. 2016) (first quoting *Herrick v. Garvey*, 298 F.3d

---

[6]        *See infra* Part III.C.1.b.

1184, 1191 (10th Cir. 2002); then citing Fed. R. Evid. 801(c)).  Plaintiff offers no exception to the hearsay rule that would permit the court to consider these statements on summary judgment. The court thus concludes that the statements are inadmissible hearsay and excludes them.

Defendants next ask the court to strike a document that plaintiff has marked Exhibit 190 (Doc. 46 at 285–301).  Plaintiff asserts that this document contains comments about Hillcrest Country Club that he has found on the internet.  Defendants ask the court to strike this exhibit because plaintiff never disclosed it as Rule 26 requires.  Plaintiff responds that he performed the internet search sometime around August 2016, so he only recently came into possession of the document and could not have disclosed it earlier.  But most of the comments are dated in 2012 and 2013, and so the information was available to plaintiff much earlier than he disclosed it. Defendants assert that plaintiff's failure to disclose this document is not justified and requires exclusion.

The court declines to decide whether plaintiff's failure to disclose this document was justified or harmless because the court excludes it for another reason—it is not authenticated.  It is well-settled that a court can consider only admissible evidence when deciding a motion for summary judgment.  Fed R. Civ. P. 56(c)(2); *Law Co., Inc. v. Mohawk Constr. & Supply Co., Inc.*, 577 F.3d 1164, 1170 (10th Cir. 2009).  "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."  Fed. R. Evid. 901(a).  A proponent may establish authenticity by the evidence's "appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances."  Fed. R. Civ. 901(b)(4); *Law Co.*, 577 F.3d at 1171.  Here, plaintiff has no response to defendants' challenge to the document's authenticity.  The court cannot discern from the appearance or

content of Exhibit 190 that it is, in fact, genuine comments posted on the internet. The court thus excludes Exhibit 190 because plaintiff has failed to authenticate it.

The third target of defendants' motion to strike is paragraphs 11 through 13 and 15 through 20 plaintiff's Affidavit (Doc. 46 at 267–73; Doc. 47 at 280–86). Defendants claim these portions of the Affidavit contain inadmissible hearsay. The court agrees. These paragraphs describe conversations plaintiff says he had with four individuals about the article at issue here. Plaintiff's Affidavit provides these individuals' out-of-court statements about their reactions to the article and their beliefs about its truth. Plaintiff offers these statements to prove that the article was false. So, each paragraph contains an "out-of-court written statement . . . now offered to prove the truth of the matter asserted." *Brown*, 835 F.3d at 1232 (citations omitted). The statements thus are hearsay.[7] Plaintiff offers no hearsay exception that could apply to these statements. And, without such exception, the statements are inadmissible at trial.[8] The court thus cannot consider these statements on summary judgment.

Finally, defendants ask the court to strike a document that plaintiff has marked as Exhibit 155 (Doc. 47 at 84–88). Plaintiff's summary judgment response describes this document as one containing "email[s] from Chad Weinand Golf Course Architect." Doc. 47 at 26. Plaintiff made

---

[7]     Paragraphs 15 and 16 also contain double hearsay. That is, plaintiff describes conversations that he had with Ms. Taylor about her conversations with a banker. "Double hearsay is admissible only 'if each part of the combined statements conforms with an exception to the hearsay rule . . . .'" *Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1541 (10th Cir. 1995) (quoting Fed. R. Evid. 805). Plaintiff provides no exception to the hearsay rule for either set of statements. The statements thus are inadmissible.

[8]     Even though plaintiff does not assert a hearsay exception, the court has considered whether the statements are admissible under Fed. R. Evid. 803(3), as statements of then-existing state of mind. This rule provides that a "statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health)" is not excluded by the rule against hearsay. Fed. R. Evid. 803(3). But, the exception does "not includ[e] a statement of . . . belief to prove the fact . . . believed." *Id.* The statements at issue here are four individuals' beliefs about the article, and plaintiff offers them to prove the fact that, his Affidavit says, the declarants believed. Such statements do not qualify for Rule 803(3)'s exception.

11

no response to the motion seeking to strike this particular evidence.  By failing to respond, plaintiff waived his opportunity to contest defendants' request to strike this evidence.  *See* D. Kan. Rule 7.4(b) ("Absent a showing of excusable neglect, a party or attorney who fails to file a responsive brief or memorandum . . . waives the right to later file such brief or memorandum.").  His failure to respond also allows the court to treat the motion as an uncontested one, and "[o]rdinarily . . . [to] grant the motion without further notice."  *Id.*  For this reason and others, the court excludes Exhibit 155.

The court also excludes Exhibit 155 because it violates the best evidence rule and it is inadmissible hearsay.  Exhibit 155 is not the original emails between plaintiff and Mr. Weinand.  Plaintiff testified that he had not produced the original emails, but instead had copied and pasted the emails into a Microsoft Word document.  Plaintiff's copy-and-paste document is not the best evidence, and thus is inadmissible.  *See United States v. Jackson*, 488 F. Supp. 2d 866, 871 (D. Neb. 2007) (holding that a "cut-and-paste document" was not an accurate original or duplicate because it did not reflect the entire conversation and thus was inadmissible because it was not the best evidence (citing Fed. R. Evid. 1001–04)).  Exhibit 155 also contains inadmissible hearsay.  Plaintiff offers the out-of-court statements of Mr. Weinand to prove the truth of the matter asserted—that the article is false.  He identifies no hearsay exception that could apply here.  The statements thus are inadmissible hearsay, and the court excludes Exhibit 155 for this additional reason.

In sum, for the reasons explained, the court grants in part and denies in part defendants' motions to strike.  The court declines to strike Ms. Taylor's Affidavit in its entirety, but strikes paragraphs 13 and 14 because they contain inadmissible hearsay.  The court strikes the three other types of summary judgment materials described above because:  (1) the material is not

authenticated; (2) the material contains inadmissible hearsay; or (3) the material is not the best evidence.

The court notes that even if it could consider this material, the summary judgment record still would present no genuine issues of fact requiring a trial. Plaintiff uses this material to support two elements of his defamation claim[9]—the falsity of the statements and the injury to plaintiff's reputation. As explained below, even if the court could consider the material, none of it would present a genuine issue of fact entitling plaintiff to a jury determination whether the article damaged plaintiff's reputation. The material also fails to present evidence of extreme or outrageous conduct sufficient to support a claim for intentional infliction of emotional distress. The court thus would enter summary judgment against plaintiff's two claims even if it considered all the material it has decided to strike.

## III.    Defendants' Summary Judgment Motions

The court now turns to the substance of defendants' summary judgment motions. Each defendant has filed its own summary judgment motion. Docs. 31, 33. Both motions assert that plaintiff's defamation and intentional infliction of emotional distress claims fail as a matter of law. The court agrees. It considers defendants' motions together, below, and explains the rationale for its decision to enter summary judgment.

### A.  Uncontroverted Facts

The following facts are either stipulated facts from the Pretrial Order (Doc. 29), uncontroverted, or, where controverted, stated in the light most favorable to plaintiff, the party opposing summary judgment. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

---

[9]       In Kansas, a defamation claim requires: (1) false and defamatory words; (2) communicated to a third person; (3) that injured the plaintiff's reputation. *Dominguez v. Davidson*, 974 P.2d 112, 117 (Kan. 1999).

### *Time Inc. Publishes an Online Article About Hillcrest Country Club*

On May 29, 2014, defendant Time Inc. published an article on its GOLF.com website titled "Once given up for dead, the challenging Donald Ross-designed Hillcrest Country Club is thriving again." The article chronicles the recent history of Hillcrest Country Club—Kansas City's second-oldest private golf club. The article explains that the club's golf course was designed by renowned golf course architect Donald Ross.[10] And, the article describes how Hillcrest Country Club went from enjoying a reputation among professional golfers as a challenging Ross course into Chapter 11 bankruptcy, and on to its recent resurgence.

John Garrity, a *Sports Illustrated* senior writer and Kansas City resident, authored the article. Mr. Garrity "make[s] one thing clear" at the beginning of his article, explaining that he "love[s] Hillcrest because it was [his] summer playground when [he] was a teenager. [He] played junior golf there, splashed in the pool, gorged on the Friday-night seafood buffet, caddied on weekends and stretched out on the grassy slope below the 1st tee to watch fireworks on the Fourth of July." Doc. 32-1 at 2–3. Mr. Garrity describes the memories that Hillcrest Country Club invokes for him: "Walking through the sprawling stone clubhouse, I encounter the ghosts of my chain-smoking, loquacious dad, who served a term as club president, and my older brother, Tom, who held the course record, dominated the region's amateur ranks and represented Hillcrest during a brief run on the PGA Tour." *Id.* at 3.

Mr. Garrity employs hyperbole throughout his article, including:

- "Fortunately, Hillcrest's death rattle turned out to be more of a smoker's cough." *Id.* at 2.

- "Cherchez la femme!" *Id.* at 3.

---

[10]     Donald Ross was a Scottish golf course designer who was "involved in designing or redesigning around 400 courses from 1900–1948, laying the foundation for America's golf industry." *Donald Ross (golfer)*, Wikipedia, https://en.wikipedia.org/wiki/Donald_Ross_(golfer) (last visited Mar. 15, 2017).

- "When the smoke cleared . . . ." *Id.*

- "The most pressing concern, of course, is to get Donald Ross to stop spinning in his grave." *Id.*

- "I—and a couple of clubhouse ghosts—happen to agree." *Id.* at 4.

The article describes how Hillcrest Country Club was running significant deficits when David Francis purchased it in 2006.  And, it explains one of the challenges facing Hillcrest Country Club is "the real estate market correction that has forced the closing of more than 600 courses across the U.S. in the past eight years." *Id.* at 3.  Mr. Francis attempted to "right the ship" by "turn[ing] Hillcrest's management over to a business partner who had impressed him on another project." *Id.*  But, the article says that the business partner went on a "management rampage" that drove members away from the club. *Id.*

The article repeatedly refers to the former General Manager of Hillcrest Country Club, but it never uses his name.  Instead, the article uses the pseudonym, "Vlad the Impaler."  The article's references to "Vlad the Impaler" are references to plaintiff, who served as the General Manager of Hillcrest Country Club from August 2006 until May 10, 2011.  Mr. Garrity chose to use this pseudonym because he believed it "aptly described in a rhetorical sense" plaintiff's management style "which resulted in him 'killing off' the membership."  Doc. 34-1 at 18.  Mr. Garrity did not use plaintiff's actual name in the article for two reasons:  (1) the article was written for a national audience, who would not know the former General Manager, and (2) the article was not about the club's former General Manager, but about the club.

The article includes examples about how "Vlad" drove away members with his conduct. Doc. 32-1 at 3.  Of these examples, Mr. Garrity's "favorite" anecdote was this one:  "Vlad told the chef to stop ordering Heinz ketchup as a rebuke to Democratic presidential candidate John

Kerry." *Id.*  The article also states that "Vlad even had an answer for those who quit Hillcrest: He sued them for breach of contract." *Id.*

The article also describes how the former General Manager failed to maintain the golf course.  The article quotes the then-current General Manager as saying, "'[Vlad] thought that if you didn't overseed, you didn't have to hire somebody to mow.'" *Id.*  It also quotes the then-current General Manager as saying: "'There was a lot of deferred maintenance.'" *Id.*  The article criticizes the former General Manager's decision to replace the original Donald Ross-designed ninth green with a replacement green:  "Vlad installed a replacement green some 50 yards short of Ross's [which] was tiny, perpetually soggy and propped up by a stone wall." *Id.*  Mr. Garrity explained that, "[i]n less time than it takes to schedule a deposition, one of Kansas City's strongest par-4s had been destroyed." *Id.*  The article describes how Vlad's actions culminated: "Fed up, [David] Francis fired Vlad, touching off an exchange of suits and counterclaims that entertained court reporters and baffled readers of The Kansas City Star." *Id.*  And, "when the smoke cleared, Hillcrest was broke, depopulated and sparsely staffed." *Id.*

### Statements Made in the Article by Heartland Golf

The article quotes two representatives of Heartland Golf—Davis Francis and Kurt Everett.  The statements made by these two individuals include the following:

- "'They were going to board this place [Hillcrest] up when I bought it,' Francis says, indulging in some hyperbole.  'It was overstaffed. They'd send several waiters just to pour tea in the women's card room.'" *Id.*

- "'Club presidents' widows used to get a free social membership,' says Kurt Everett, Hillcrest's general manager.  'That was nothing but goodwill, and they

came in every Friday and Saturday night and spent money.  But he took that

away.  Anything the members liked, he took away.'" *Id.*

- "'There was a lot of deferred maintenance,' says Everett. '[Vlad] thought if you

  didn't overseed, you didn't have to hire somebody to mow.'" *Id.*

- "'I came out here one day, and the green was being torn up,' Francis says,

  shuddering at the memory.  'I said, "What are you doing?"'" *Id.*

- "'I take full responsibility,' [Francis] says.  'I could have stepped in sooner.'" *Id.*

- "'I felt I needed to correct the situation,' [Francis] says.  'What happened here

  was not representative of my family or my integrity.'" *Id.*

- "'We've overdelivered on every promise we've made,' says Francis, happy to be

  wearing the white hat again." *Id.*

- "'There's so much passion for this golf course,' says Everett.  'It's a thinking

  man's golf course.  It's a gem.  And it's worth saving.'" *Id.*

### John Garrity's Research for the Article

Mr. Garrity is a professional sports writer.  For more than 30 years, he was a Special

Contributor for *Sports Illustrated*.  Although he retired from the publication in 2010, he

continues to write articles as a senior writer.  To write the article that is the subject of this

litigation, Mr. Garrity relied on his firsthand knowledge about Hillcrest Country Club as well as

many interviews with the club's then-current management, current and former employees, and

current and former members.  Mr. Garrity also conducted independent research for the article.

He reviewed publically available information about other country clubs' finances and operations

and published reports about Hillcrest Country Club.  Mr. Garrity never learned any information

that made him doubt any of the statements written in the article.  To the contrary, Mr. Garrity

believed when he wrote the article—and still believes today—that the statements in the article are true.

Hillcrest Country Club did not pay Mr. Garrity or provide him with any other consideration for writing the article. The only compensation that Mr. Garrity received was his standard perpublished-word compensation from *Sports Illustrated*.

### Plaintiff Learns About the Article

Plaintiff first learned about the article in September 2014, when he read it online. Plaintiff does not recall if he stumbled upon the article himself or if someone told him about it. After reading the article, plaintiff read it a second time, and then called his lawyer. When plaintiff first read the article, the only thing he knew about Vlad the Impaler was that he was Dracula's son. The only person with whom plaintiff has discussed the meaning of Vlad the Impaler is his attorney.

### Plaintiff Discusses the Article with His Friends

About six months after plaintiff learned about the article, he contacted Chad Weinand and Rusty Hamman about it. Mr. Weinand formerly provided design and renovation services at Hillcrest Country Club. Mr. Hamman is a former superintendent at Hillcrest Country Club. Plaintiff sent the article to Mr. Hamman by email. According to plaintiff, neither Mr. Weinand nor Mr. Hamman believed the article's contents. Plaintiff testified that Mr. Weinand "knows what was printed in the article was a pack of lies." Doc. 32-2 at 7. Plaintiff described Mr. Weinand's reaction to the article as: "[h]e couldn't believe it . . . . He was flabbergasted . . . . He said it's just not true . . . all that is total lies . . . . He said everything they said in that article's not true." *Id.* at 14. Plaintiff similarly testified that Mr. Hamman "knows everything they printed in

that article is a pack of lies." *Id.* at 9.  Plaintiff specifically testified that Mr. Hamman did not believe any part of the article because he knew it wasn't true.

Plaintiff also spoke with a friend, John Miles, about the article.  According to plaintiff, Mr. Miles thought the article was ridiculous.  Plaintiff explicitly testified that Mr. Miles did not believe the statements made in the article about plaintiff.   Plaintiff also spoke with Debby Taylor about the article.  Plaintiff has known Ms. Taylor since kindergarten.  Plaintiff specifically testified that Ms. Taylor did not believe the article.

Plaintiff also contacted Steve Vockrodt, a former reporter with *The Olathe Daily News*, about the article.  Plaintiff sent Mr. Vockrodt a copy of the article by email and asked him to "[f]ollow up and see if you can get a story out of it."  Doc. 32-4 at 12.  Plaintiff offered to "go over it with [Vockrodt] and tell you where it is false, if you want to."  *Id.*  In his deposition, plaintiff explained that he was suggesting that Mr. Vockrodt pursue "a story that Mr. Garrity was grinding an ax and using *Sports Illustrate*d, big *Sports Illustrated*, to defame a little individual like [plaintiff]."  Doc. 34-2 at 17.  Other than the individuals described above, his lawyer, and his doctors, plaintiff does not recall ever speaking to anyone else about the article.

### Plaintiff's Life After the Article's Publication

About 18 months after the article was published, plaintiff submitted a resume online to ClubCorp and Billy Casper Golf.  Plaintiff received a confirmation that these employers had received his online submission, but plaintiff has received no other communications from either ClubCorp or Billy Casper Golf.  Plaintiff also sent a letter to the owner of Brookridge Country Club in California.  He has received no response from this club.  Plaintiff told the realtors who were trying to sell Sycamore Ridge Golf Course that he was interested in a management job at that course, but plaintiff never heard back from anyone.  Plaintiff does not recall applying for

employment anywhere else since the publication of the article.  Plaintiff also does not recall attempting to engage in any business transaction or applying for a loan or any other type of financing since the article's publication.  Plaintiff has not lost any business opportunities or suffered any economic damages because of the article's publication.[11]

Plaintiff testified that the article has caused him anxiety.  He describes "[d]iarrhea, knots in [his] stomach, [he] can't relax, sleepless nights, shaking."  Doc. 34-2 at 21.  Plaintiff first began taking prescription drugs for his anxiety sometime around March or April 2016.  Plaintiff previously took medication for anxiety in 2011, when he was fired from Hillcrest Country Club and David Francis called the police on him.  Plaintiff produced no documents showing that he received any medical or psychological treatment because of the article.

### Other Publications Have Written Articles about Plaintiff's Management of Hillcrest Country Club

Other newspapers have published articles about the issues facing Hillcrest Country Club and plaintiff's involvement in its management.  For example, on November 4, 2011, the *Kansas City Business Journal* published an article titled "South KC's Hillcrest Country Club faces foreclosure sale."  Doc. 34-4 at 81.  The article describes the pending foreclosure sale of the club, and notes the ownership dispute between plaintiff and David Francis.  The article also explains that plaintiff filed a lawsuit against Mr. Francis alleging that Mr. Francis provided capital and financing, while plaintiff provided the "operational management" of the club.  *Id.*

On December 6, 2011, *The Kansas City Star* published an article titled "Country club in legal battle."  *Id.* at 82–83.  The article describes the then-ongoing lawsuit between plaintiff and Mr. Francis.  It also provides the following description of plaintiff's management of and termination from Hillcrest Country Club:

---

[11]     Plaintiff has attempted to controvert these facts with Debra Taylor's Affidavit.  But, as explained below, nothing in this Affidavit controverts these facts.

> It didn't take long for David Francis, from a prominent Kansas City family, and the golf guy, [plaintiff], to offend longtime members, most of whom quickly bailed.
>
> Within 24 months, 90 percent of the membership was gone," said Kevin Clune, president of the board at the time of the sale.
>
> [Plaintiff] and Clark then turned on each other in an ownership dispute.
>
> In May, Francis attempted to fire [plaintiff] and sued to remove him from the Hillcrest clubhouse.  [Plaintiff] refused to leave, hunkered down and sued back, filing for a protection order and claiming he owned half of Hillcrest.
>
> Things got so bad that only a last-minute development in November saved Hillcrest from being auctioned on the courthouse steps.

*Id.* at 82.

On Sunday, January 13, 2013, *The Kansas City Star* published a front-page article titled "Out of the rough, a jewel regains its shine."  *Id.* at 84.  The article notes that "[n]ot long ago, Hillcrest . . . had more lawsuits than holes."  *Id.*  The article describes how "Francis and a business partner took over Hillcrest in 2006 and immediately offended longtime members by curtailing traditions and firing well-liked employees."  *Id.*  The article provides:  "Francis and the partner, [plaintiff], then turned on each other, suing over ownership.  Membership plummeted. Things got so bad that only a last-minute development saved Hillcrest from being auctioned on the courthouse steps."  *Id.*  The article quotes a former club president describing the conditions of the club after plaintiff left:  "He saw dead trees, bare spots, brush and lots of deferred maintenance.  'It was pretty hard to look at . . . . They had a mountain of work to do.'"  *Id.* at 85. The article also refers to design changes that plaintiff made to the Donald Ross-designed golf course.  And, it quotes Mr. Garrity on those changes:  "'I couldn't believe it when I saw it,' said John Garrity, a Kansas City based golf writer for Sports Illustrated.  'For that to be done to this great Donald Ross green was like putting a mustache on the Mona Lisa.'"  *Id.*  The article ends

with a quote from Mr. Francis: "'We went down the wrong road and I know it's going to take time to come back all the way,' Francis said. 'But this is about lessons learned. We've moved on and I hope people will see that.'" *Id.*

After *The Kansas City Star* published this article, plaintiff contacted Steve Vockrodt, who was then working for *Pitch.* Plaintiff suggested that Mr. Vockrodt look into the matter and write an article. Plaintiff spoke with Mr. Vockrodt several times and provided him with documents to assist him in writing such an article. On November 14, 2013, *Pitch* published an article authored by Mr. Vockrodt. The article was titled "Former business partners chip-shot each other in a legal battle over Hillcrest Country Club." *Id.* at 86. The article describes how club members "left in droves due to the way Francis and [plaintiff] managed the course." *Id.* And, it states that "Hillcrest sued former members for leaving, and the former members filed countersuits." *Id.*

The article quotes a former Hillcrest Country Club member as saying: "'David let [plaintiff] be in charge, and [plaintiff] is a very difficult person and he seemed to be intentionally chasing members away, just making decisions that made you feel like you were a fool for paying them money voluntarily every month,' the former member says." *Id.* at 87. The article quoted another former member: "'The way the club was going, to pay the fees it cost, it wasn't worth it,' says Jim Glynn, an advertising executive and former Hillcrest member. 'The food was gone. Events were gone. They weren't taking as good a care of the course.'" *Id.*

The article also describes the then on-going litigation between plaintiff and Mr. Francis. On this subject, the article provides:

> The trial record reads as though well-paid lawyers and a judge had to oversee a turf battle between fifth-graders. Francis complained that [plaintiff] left Hillcrest but not before taking such things as a 32-inch television and a $300 gun safe. [Plaintiff] responded that Francis couldn't prove he had them.

> At one point, attorneys spent considerable time trying to track down a gun that Francis had bought at Cabela's five years earlier. Francis said he bought the 40-caliber pistol, registered in his name and left with [plaintiff] at Hillcrest.
>
> When [plaintiff] was rousted from the apartment, the gun was nowhere to be found. Francis' attorneys complained several times to the Jackson County judge overseeing the case that [plaintiff] wasn't giving it back.
>
> After the judge ordered [plaintiff] to return the gun, [plaintiff] said he couldn't find it.

*Id.*

### Public Court Filings Contain Club Member's Descriptions and Opinions About Plaintiff's Management of the Club

The bankruptcy filings in Hillcrest Country Club's Chapter 11 case include a description of plaintiff's management:

> The Debtor was never profitable, although operations showed improvement through 2008. In the following years, the effects of the economic downturn and [plaintiff's] management took their toll on operations. Membership dropped from approx. 250 members at the start of 2008 to less than 50 by 2010 . . . By early 2011, it was clear that significant changes needed to be implemented. In May 2011, the Debtor reorganized the management team and terminated [plaintiff].

Doc. 34-4 at 3.

While plaintiff was Hillcrest Country Club's General Manager, the club sued several former members. And, one group of former members filed a suit against the club. The publically available filings in that lawsuit contain sworn statements about plaintiff's management of the club.

The former members criticized plaintiff's interactions with club members. One former member stated under oath: "[Plaintiff] bragged . . . that Hillcrest will file suit against any and all members who attempt to resign." Doc. 34-3 at 49. Another former member stated under oath: "[Plaintiff] made references to suing former Hillcrest members and kicking their asses in court."

*Id.* Another former member stated under oath: "[Plaintiff] treated many members with disdain and in a degrading manner on numerous occasions." *Id.* at 73. And, another former member described, under oath, how plaintiff kicked out another club member because he had authored an email criticizing the club's management. That member was a recipient of the email, and he found "nothing in [the] email that [he] portrayed as offensive." Doc. 32-7 at 35. He agreed with "mostly all of [the email's] complaints" about "lack of service by the club, hostility from management, and extremely poor course management." *Id.* The same former member "even questioned [plaintiff's] ability to run or manage Hillcrest or any other business due to his aggressive behavior and his disdain for other members." *Id.*

The former club members also complained about the conditions of the golf course during plaintiff's management. Some of the statements, made under oath, complained about the lack of mowing: "The standards of service that were not maintained consisted of basically the course. The rough was grown up 6 feet because Hillcrest did not want to mow the grass to reduce expenses." (*Id.* at 20); "The worst change to the golf course that I observed was the lack of mowing in some of the areas." (*Id.* at 18); "The discontinuance of mowing the golf course in an acceptable manner for regular and competitive play was prevalent." (*Id.* at 18–19); "Uncut greens, poor leaf removal and unsightly long grass all contributed to what I considered a major downturn at Hillcrest. When I asked [plaintiff] about the long grass, he said 'it was to keep the turkeys from eating the fairway grass.' [Plaintiff] also stated 'that it cut back on labor not having to always mow the long grass.'" (*Id.* at 24–25); "To save money, large swaths of the golf course were no longer mowed, causing delays and confusion to golfing members." (*Id.* at 21).

Other complaints, made under oath, involved the redesign of the Donald Ross golf course: "Amateurish golf course modifications were made that ignored a detailed master-plan

the Club had procured." (*Id.*); "I quit taking guests to the club, for the most part, in 2007 because of the unsightly condition caused by changes in the golf course, and its poor condition." (*Id.* at 23); "that [plaintiff] and management of Heartland would be redesigning holes of the golf course without warning, input or any agreement with me or other members." (*Id.* at 14); "[plaintiff] took it upon himself to redesign many parts of the golf course." (*Id.* at 31).

### *Plaintiff's Description of His Management Style*

Plaintiffs was responsible for "everything" that went on at Hillcrest Country Club when he served as General Manager.  Doc. 32-2 at 2.  His duties included supervising the building of the new green on the ninth hole.  In his deposition, plaintiff referred to Hillcrest Country Club's members as "crybabies" who had "embezzled, cheated, stealed and bankrupted the club."  Doc. 34-2 at 25.  Plaintiff also described himself as "the boss that has to try to right a financial wreck."  *Id.*  When asked whether he had "chewed" anyone out for leaving a drink on the piano, plaintiff acknowledged that "I'm sure I did say something."  *Id.* at 235.

### *Plaintiff Hosted a Conservative Talk Radio Show Under the Pseudonym "Gabby Haze"*

During part of the time plaintiff served as Hillcrest Country Club's General Manager, he also hosted a conservative talk radio show on a local radio station, using the pseudonym Gabby Haze.  During his show, plaintiff repeatedly referred to Democratic elected officials as "Democraps."  These officials included former Vice-President Al Gore, then-Senator Joe Biden, then-Senator John Kerry, and Congresswoman Nancy Pelosi.

Plaintiff featured what he called "parodies" on his radio show.  Doc. 34-2 at 32.  In these segments, plaintiff parodied celebrities such as Mother Teresa and Michael J. Fox.  He also parodied local officials such as school board members and local legislators.

In addition to his radio show, plaintiff was active in local affairs.  His activism led to local media reports quoting him on several occasions.  *The Olathe News* also included plaintiff in their list of "Olathe's 150 most notable people"—that the newspaper published on December 9, 2008, in connection with its 150th anniversary.  Doc. 34-4 at 57, 58.  The listing contains the following description of plaintiff:

> Terry Clark has lived in the Olathe community for several years, but in the past five years he has emerged as a grassroots activist. His conservative perspective has been a beacon for some and a constant agitation for others.  His popularity led to a short stint as a conservative talk show host, but it is his ability to shed light on issues and view of government officials that brought him comparison to another Olathe community activist, Bob Huggins.

*Id.* at 58.

### B.  Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that "no genuine dispute" exists about "any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  When it applies this standard, the court views the evidence and draws inferences in the light most favorable to the non-moving party.  *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010).  "An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue."  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense."  *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

The moving party bears "both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law."  *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (citing *Trainor v. Apollo*

*Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)).  To meet this burden, the moving

party "need not negate the non-movant's claim, but need only point to an absence of evidence to

support the non-movant's claim." *Id.* (citing *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d

1121, 1125 (10th Cir. 2000)).

If the moving party satisfies its initial burden, the non-moving party "may not rest on its

pleadings, but must bring forward specific facts showing a genuine issue for trial [on] those

dispositive matters for which it carries the burden of proof." *Id.* (quoting *Jenkins v. Wood*, 81

F.3d 988, 990 (10th Cir. 1996)); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986);

*Anderson*, 477 U.S. at 248–49.  "To accomplish this, the facts must be identified by reference to

affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at

670 (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992)).

Summary judgment is not a "disfavored procedural shortcut." *Celotex*, 477 U.S. at 327.

Instead, it is an important procedure "designed 'to secure the just, speedy and inexpensive

determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1).

### C.  Analysis

Plaintiff asserts two claims based on Kansas[12] law:  (1) defamation, and (2) intentional

infliction of emotional distress.  Doc. 29 at 8 (Pretrial Order, Part 4.a).[13]  Defendants move for

summary judgment against both claims.  The court addresses each, in turn, below.

---

[12]      The parties agree that Kansas law governs the substantive issues in the case.  Doc. 29 at 2
(Pretrial Order, Part 1.d).  The court thus applies Kansas law when deciding the summary judgment
motions. *See State Farm Fire & Cas. Co. v. Gates, Shields & Ferguson, P.A.*, No. 14-2392-EFM-GLR,
2016 WL 3570793, at *7 (D. Kan. July 1, 2016) (applying to summary judgment motions the law the
parties agreed to apply).

[13]      In one of his responses to the summary judgment motions, plaintiff refers to the tort of invasion
of privacy.  Doc. 47 at 52.  Plaintiff asserts no such claim in the Pretrial Order.  The Pretrial Order
"controls the subsequent course of the litigation, and the trial court may 'exclude from trial those issues
and claims not found in the pretrial order.'" *Berroth v. Farm Bureau Mut. Ins. Co., Inc.*, 232 F. Supp. 2d

### 1.    Defamation Claim

The tort of defamation includes both libel and slander.  *Dominguez v. Davidson*, 974 P.2d 112, 117 (Kan. 1999).  In Kansas, a plaintiff asserting a defamation claim must establish that a defendant:  (1) uttered false and defamatory words; (2) communicated them to a third party; and (3) caused injury to plaintiff's reputation.  *Sunlight Saunas, Inc. v. Sundance Sauna, Inc.*, 427 F. Supp. 2d 1032, 1071 (D. Kan. 2006) (applying Kansas law and citing *Luttrell v. United Tel. Sys., Inc.*, 683 P.2d 1292, 1293 (Kan. Ct. App. 1984)).  "A corporation may be liable for the defamatory utterances of its agent which are made while acting within the scope of his authority."  *Dominguez*, 974 P.2d at 117 (quoting *Lindemuth v. Goodyear Tire & Rubber Co.*, 864 P.2d 744, 750 (Kan. Ct. App. 1993)).

A defendant may assert truth and privilege as affirmative defenses to a defamation claim.  *Id.* at 121.  "A qualified privilege is restricted to situations where public policy favors free exchange of information over the individual's interest in good reputation."  *Sunlight Saunas*, 427 F. Supp. 2d at 1071.  When a qualified privilege exists, a plaintiff must prove not only that the statements were false but also that the defendant made the statements with actual malice, "that is, with actual evil-mindedness or specific intent to injure."  *Dominguez*, 974 P.2d at 117 (citation and internal quotation marks omitted).

Here, the summary judgment record presents no triable issue of fact on at least two of the requirements for a defamation claim.  That is, no genuine issues of fact exist that could permit a rational jury to conclude either that:  (a) plaintiff has sustained injury because of the article, or

---

1244, 1249 n.7 (D. Kan. 2002) (quoting *Hullman v. Bd. of Trs.*, 950 F.2d 665, 668 (10th Cir. 1991)).  The court thus ignores plaintiff's references to this unasserted claim.  Indeed, plaintiff never pleaded this cause of action in his Complaint.

(b) any of the article's statements are both false and defamatory.[14]  The court thus grants

summary judgment against plaintiff's defamation claim for these two, independent reasons.

### a.  Plaintiff presents no evidence creating a triable issue whether the article damaged his reputation.

The summary judgment record presents no triable issue whether the article caused

damage to plaintiff's reputation.  Plaintiff testified that he has applied for a few jobs since his

termination from Hillcrest Country Club, but has not received any employment offers.  He has

not come forward with admissible evidence, though, that might permit a reasonable jury to find

that these prospective employers did not hire him because of the article's publication.  Plaintiff

also asserts that he has suffered anxiety because of the article.  But, in Kansas, a plaintiff "cannot

recover in a defamation action for mental anguish in the absence of proof of . . . injury to

reputation."  *Gobin*, 649 P.2d at 1244.  "Defamation actions in Kansas are primarily concerned

with injury to reputation, not injury to one's personal sensitivities."  *Id.*  Without any evidence of

damage to plaintiff's reputation, his defamation claim fails as a matter of law.  *See*, *e.g.*,

*Dominguez*, 974 P.2d at 119–20 (affirming summary judgment against plaintiff's defamation

claim because "the record is devoid of evidence of such a nature that would show how plaintiff's

reputation in the community of his residence has been affected"); *Lindemuth*, 864 P.2d at 751

(same).

---

[14]     Defendant Time Inc. also argues that plaintiff's defamation claim fails because plaintiff was a limited public figure, thus rendering the allegedly defamatory statements subject to a qualified privileged and requiring plaintiff to prove actual malice.  But, the "defense of privilege does not extend to a publication to the general public."  *Sunlight Saunas*, 427 F. Supp. 2d at 1072 (quoting *Knudsen v. Kan. Gas & Elec. Co.*, 807 P.2d 71, 79 (Kan. 1991)).

     Our court has held an internet publication constitutes publication to the general public to which the qualified privilege defense does not apply unless the defendant shows that the general public has a corresponding interest in the communication.  *Id.*  The parties do not dispute that the article at issue here was published on the internet.  The article thus constitutes a publication to the general public to which the privilege generally does not apply.  But Time Inc. never addresses the question whether the general public has a corresponding interest in the communication, *i.e.* an interest in the management of a private golf club.  Without such a showing, the court cannot apply the privilege defense.

Instead of submissible evidence, plaintiff presents nothing but speculation hoping it will support the injury element of a defamation claim. He asserts that "anyone that [G]oogles and searches [plaintiff] will find the scurrilous Sports Illustrated Article and yes [plaintiff] has had loss of income directly from this Article." Doc. 47 at 47. The only evidence that plaintiff cites to support this statement is Debra Taylor's Affidavit. As explained above, the court cannot consider the hearsay statements contained in Ms. Taylor's affidavit. And, even if it could consider the Affidavit's assertions, it creates no triable issues of fact.

Indeed, plaintiff conceded in his deposition that he lost no business opportunities because of the article's publication. Plaintiff also admitted that he had spoken with Ms. Taylor about the article and that she did not believe what it said. Still, plaintiff claims that he has lost business opportunities because of the article and he then grounds this assertion in Ms. Taylor's statements. But the problem is that Ms. Taylor's Affidavit never attributes any of her opinions about plaintiff to the article's contents. Instead, Ms. Taylor states that she had doubts about hiring plaintiff after she read the article, but nevertheless continued to employ him as the supervisor of a retail construction project. And though Taylor asserts that she will not hire plaintiff again after the current project is completed, she never says why. Importantly, Ms. Taylor never asserts that what she read in the article is the reason she would not hire plaintiff again.

Ms. Taylor also references conversations with her bankers, who, she contends, have been harassing her about plaintiff's involvement with her project. Ms. Taylor reports that her bankers "Googled" plaintiff and did not like what they found. But again, Ms. Taylor does not state what the bankers found—whether it was the article at issue here or something else.

Also, plaintiff's suggestion that his reputation has sustained damage because anyone who searches the internet for plaintiff's name will find the article is simply unsupported speculation.

30

This is so for two reasons. For one, this statement assumes that the person performing the search will find the article even though it never mentions plaintiff's name. Also, plaintiff's speculative conclusion assumes that the reader will form a negative opinion about plaintiff after reading the article. Plaintiff cannot avoid summary judgment by such speculative and unsupported assertions. *See Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (explaining that, to defeat a motion for summary judgment, the non-moving party's "evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise").

Because the summary judgment record here presents no evidence for a jury to conclude that the article damaged plaintiff's reputation, plaintiff's defamation claim fails as a matter of law.

### b.  The alleged defamatory statements are not both false and defamatory.

The court also grants summary judgment against plaintiff's defamation claim for another, alternative reason—the alleged defamatory statements are not false and defamatory. A defamation claim requires publication of a statement "that is both defamatory and false." *Ruebke v. Globe Commc'ns Corp.*, 738 P.2d 1246, 1250 (Kan. 1987). A statement is defamatory if it "diminish[es] the esteem, respect, goodwill or confidence in which the plaintiff is held" or "excite[s] adverse, derogatory or unpleasant feelings or opinions against him." *Gobin v. Globe Publ'g Co.*, 649 P.2d 1239, 1243 (Kan. 1982) (quoting William L. Prosser, *Law of Torts* 739 (4th ed. 1971)). A defamatory statement "necessarily . . . involves the idea of disgrace." *Id.* (quoting Prosser, *supra* at 739).

The court must "make the initial determination [whether] a statement is capable of conveying a defamatory meaning." *Hobson v. Coastal Corp.*, 962 F. Supp. 1407, 1411 (D. Kan. 1997) (citing *Woodmont Corp. v. Rockwood Ctr. P'ship*, 811 F. Supp. 1478, 1481 (D. Kan.

1993)).  When it performs this function, "the court must consider all the circumstances

surrounding the communication." *Id.* (citing Restatement (Second) Torts § 614 cmt. a (1989)).

The falsity requirement of a defamation claim means that "the matter published

concerning the plaintiff is not true." *Rinsley v. Brandt*, 700 F.2d 1304, 1307 (10th Cir. 1983)

(applying Kansas law and quoting Restatement (Second) of Torts § 652E cmt. a).  But, "[w]here

the published statements are substantially true, . . . no liability" exists "and a motion for

summary judgment is proper." *Ruebke*, 738 P.2d at 1250.

Similarly, statements of opinion are not actionable. *Rinsley*, 700 F.2d at 1307.  "Whether

a given statement constitutes an assertion of fact or an opinion is a question of law" for the court

to decide. *Id.*  When making this determination, the court should consider "the light of the nature

and content of the communication taken as a whole." *Id.* (citation and internal quotation marks

omitted).  "[A] statement in the form of an opinion is actionable only if it implies the allegation

of undisclosed defamatory facts as the basis for the opinion." *Phillips v. Moore*, 164 F. Supp. 2d

1245, 1259 (D. Kan. 2001) (citing Restatement (Second) of Torts § 566 (1977)).

Plaintiff's arguments about the false and defamatory nature of the statements in the

article are generalized ones.  He describes the article, generally, as a "malicious hit piece" that

was published "in an effort to destroy his reputation and the man himself."  Doc. 47 at 29.  In the

Pretrial Order, plaintiff also asserts, generally, that defendants defamed him with statements in

the article.  Doc. 29 at 6 (Pretrial Order, Part 3.a).  But the only statement that plaintiff identified

in the Pretrial Order[15] as a defamatory one is the "article's use of the name 'Vlad the Impaler.'"

*Id.*  He contends that using this name to refer to him is "infantile and highly non-professional,

and designed to subvert the rule of law." *Id.*  Although not preserved in the Pretrial Order,

---

[15]        Plaintiff was represented by counsel through the pretrial proceedings, including drafting and
submission of the Pretrial Order and appearance at the Final Pretrial Conference.

plaintiff elsewhere identified 13 paragraphs of the article that contain statements that are purportedly defamatory. *See* Doc. 8 (plaintiff's Response to defendants' Motion for a More Definite Statement). Defendants assert that plaintiff's failure to include these statements in the Pretrial Order waives his right to rely on them. *See* Fed. R. Civ. P. 16(d) (stating that the Pretrial Order "controls the course of the action unless the court modifies it"); *see also Wilson v. Muckala*, 303 F.3d 1207, 1215–16 (10th Cir. 2002) (explaining that "claims, issues, defenses, or theories of damages not included in the pretrial order are waived even if they appeared in the complaint"). But, giving plaintiff's claim the broadest interpretation possible, the court considers all statements that plaintiff alleges are defamatory to decide whether any statement is both false and capable of conveying a defamatory meaning.

When considering each statement, the court is mindful that a defamatory statement must "diminish the esteem, respect, goodwill or confidence in which the plaintiff is held" or "excite adverse, derogatory or unpleasant feelings or opinions against him," and the statement must "necessarily . . . involve[ ] the idea of disgrace." *Gobin*, 649 P.2d at 1243. As the court already has concluded, above, plaintiff has presented no admissible evidence that the statements plaintiff relies on have diminished his reputation, caused others to hold unpleasant feelings or derogatory opinion about him, or disgraced him. Without such a showing, the court is skeptical that any of the alleged statements are capable of conveying a defamatory meaning. The purported defamatory statements also fail to support an actionable defamation claim for the following reasons.

### i.     David Francis is the Owner of Hillcrest Country Club.

The article identifies David Francis as Hillcrest Country Club's owner since 2006. Plaintiff contends that this statement is false because the corporate entity, Heartland Golf, owns

Hillcrest Country Club, not Mr. Francis personally.  Yet, plaintiff concedes that Heartland Golf's

equity owners are Mr. Francis and his family members.  Doc. 8 at 1; Doc. 47 at 36.  So, perhaps,

the statement is "technically false," but such a "difference between the meaning conveyed and

the actual truth is simply too slight to be actionable."  *Rinsley*, 700 F.2d at 1308 (affirming

summary judgment because the "technical difference between 'instituting' a suit and going to see

a lawyer about filing a suit is insignificant" and thus too minor to support an actionable

defamatory statement).  This statement also does not defame plaintiff.  It does not disgrace him.

In fact, the statement never references him at all.  The statement thus cannot support a

defamation claim.

### ii.    Plaintiff's "Management Rampage"

The article describes the former General Manager of Hillcrest Country Club as someone

who initiated a "management rampage."  Doc. 32-1 at 3.  The article recites specific actions

allegedly taken by the former manager and describes them as "disturbing."  *Id.*  Plaintiff

concedes that Mr. Garrity's use of the word—disturbing—to describe his management style is

"editorial comment."  Doc. 8 at 3.  Such editorial comment constitutes an opinion.  And, plaintiff

cannot support a defamation claim with Mr. Garrity's mere opinion about plaintiff's

management practices when that opinion is "not capable of being shown true or false."  *El-Ghori

v. Grimes*, 23 F. Supp. 2d 1259, 1269 (D. Kan. 1998) (applying Kansas law to defamation

claims); *see also Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21 (1990) (explaining that a

defamatory statement must be "sufficiently factual to be susceptible of being proved true or

false.").  Here, Mr. Garrity's opinion that plaintiff went on a "management rampage" is not a

statement capable of proof as either true or false.  One person's vision of a "management

rampage" might be another's view of aggressive or proactive management.  So, this opinion is not actionable as a defamatory statement.

The court understands that an opinion can support a defamation action, but "only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion." *Phillips*, 164 F. Supp. 2d at 1259 (citing Restatement (Second) of Torts § 566 (1977)).  That is not what happened here.  Mr. Garrity disclosed the facts upon which he based his opinion that plaintiff went on a management rampage.  And, the summary judgment record shows that the facts Mr. Garrity used to support his opinion "are substantially true." *Ruebke*, 738 P.2d at 1250; *see also Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991) (explaining that a statement is not actionable if "the substance of the charge" is "true, irrespective of slight inaccuracy in the details . . . . Put another way, the statement is not considered false unless it would have a different effect on the mind of the reader from that which the pleaded truth would have produced" (citations and internal quotation marks omitted)).

For example, the article states that the former General Manager chewed out a member who had left a drink atop the club's grand piano.  Plaintiff conceded in his deposition that he was sure he said something if anyone left a drink on the piano.  The article also accuses plaintiff of suing members who tried to quit the club.  It is uncontroverted that the club sued its former members.  It is also uncontroverted that plaintiff believes he was responsible for everything at the club during his tenure as manager.  The statement that plaintiff—not the corporation—sued former members is merely a technical distinction that does not make the statement false.

Also, Mr. Garrity believed when he wrote the article—and still believes today—that plaintiff went on a management rampage that resulted in scores of members quitting the club.  The summary judgment record contains uncontroverted evidence showing that Hillcrest's

membership declined during plaintiff's tenure.  Thus, even if plaintiff disputes the substance of the specific incidents upon which Mr. Garrity based his opinion, the differences between the facts in the article and those in the summary judgment record are sufficiently minor ones that cannot support a defamation claim.  *See Rinsley*, 700 F.2d at 1308 (explaining that technical differences and minor inaccuracies are not actionable).

### iii.    Removal of Heinz Ketchup

The article also includes an anecdote about how the club's former manager "told the chef to stop ordering Heinz ketchup as a rebuke to Democratic presidential candidate John Kerry. (Cherchez la femme!)"  Doc. 32-1 at 3.  Plaintiff asserts that this statement is false because he did not order products simply based on political beliefs.  And yet, plaintiff fails to show how this statement about his alleged direction to the chef defamed him.  Indeed, the statement is consistent with plaintiff's other statements about his personal political views.  Plaintiff, while the host of a local talk radio show, repeatedly referred to Democratic elected officials, including John Kerry, as "Democraps."

Plaintiff also contends that the use of the phrase, "Cherchez la femme!," is sophomoric and unprofessional, and defamatory toward him.  Doc. 8 at 3.  This French phrase means "look for the woman" and the article's author used it to imply that the cause of a problem lies with the woman.  In context, the article's use of the phrase here appears to refer to John Kerry's wife— Theresa Heinz Kerry.  The French phrase is not a reference to plaintiff.  So, the statement is not a defamatory one directed at plaintiff.

### iv.    Membership Changes

The article states that plaintiff took away things that the club's members liked, including free social memberships for former club presidents' widows.  Plaintiff's summary judgment

response asserts that defendants produced no evidence to show that the membership changed the

rules for widows.  Doc. 47 at 38.  Plaintiff concedes, though, that he enforced the rules created

by the membership.  Doc. 8 at 3.  And, he testified that he was responsible for everything that

went on at the club.  Thus, no reasonable jury could conclude that a statement about plaintiff's

enforcement of the membership rules is anything but substantially true.  *Ruebke*, 738 P.2d at

1250 (explaining that summary judgment is proper where published statements are substantially

true).

### v.    Membership Decline

The article also describes Hillcrest County Club's declining membership during

plaintiff's tenure as manager.  The summary judgment record shows this statement is not false.

Plaintiff did not controvert the statement made in a document filed in Hillcrest Country Club's

Chapter 11 bankruptcy case:  "Membership dropped from approx. 250 members at the start of

2008 to less than 50 by 2010."  Doc. 34-4 at 3.  The club's declining membership also was

reported in several news publications, including a front page story on the Sunday edition of *The

Kansas City Star*, which described how the club's membership plummeted during plaintiff's

tenure.  Plaintiff provides no summary judgment evidence to dispute the declining membership

numbers.  Thus, no reasonable jury could conclude from these facts that the statements about

declining membership are false.

### vi.    Lawsuits Against Club Members

The article also asserts that plaintiff initiated lawsuits against club members who tried to

resign their memberships.  Plaintiff concedes that the club filed many lawsuits against former

members.  He objects to the article's description, however, because the club, not plaintiff, filed

these lawsuits.  Yet, plaintiff testified that he was responsible for everything at the club.  So, the

statement that plaintiff, instead of the corporation, filed these lawsuits is merely a technical distinction that does not render the statement false.  *See Rinsley*, 700 F.2d at 1308 (explaining that technical differences and minor inaccuracies are not actionable).  Also, the summary judgment record includes several sworn statements from former members describing how plaintiff bragged about filing suit against members who attempted to resign.  Plaintiff did not controvert those sworn statements.  The summary judgment evidence thus creates no triable issue about the falsity of this statement.

### vii.   Changes to the Golf Course

The article attributes certain changes to the club's Donald Ross-designed course, including replacement of the ninth green, to plaintiff.  These statements are not false.  Plaintiff concedes that the ninth green was changed "with help from [plaintiff]."  Doc. 8 at 5.  And, he testified in his deposition that he supervised the building of the ninth hole's new green.

Plaintiff also takes issue with the article's statements that he "went after Donald Ross" and that, because of the changes, Donald Ross is "spinning in his grave."  Doc. 32-1 at 3.  Plaintiff asserts that Mr. Ross "was dead long before" he was born and, thus, he never met the man.  Doc. 8 at 4.  The statements about Donald Ross, of course, are hyperbole and metaphor, not the stuff of actionable defamatory statements.  *See Rinsley*, 700 F.2d at 1309 (affirming summary judgment against claims based on mere exaggerated expressions of criticism and rhetorical hyperbole, not false assertions of fact).

### viii.   Maintenance of the Golf Course and Club

The article asserts that plaintiff failed to maintain parts of the golf course during his management, including that he failed to mow the greens as often or clear debris from the course after storms.  Mr. Garrity's description of the golf course's poor condition is an opinion.  Mr.

Garrity asserts by Affidavit that he believed when he wrote the article—and still believes today—that plaintiff did not perform proper maintenance during his tenure as General Manager. He formed this opinion based on information provided by club employees and club members. And the record supports those individuals' beliefs, that plaintiff failed to maintain the golf course.  In sworn and uncontroverted testimony, several members complained about deferred maintenance and the golf course's condition, including infrequent mowing.  Also, several of the newspaper articles—published before the GOLF.com article at issue here—describe deferred maintenance projects at the club.  One article includes a quote from a former member who thought the club was not taking good care of the golf course.

Plaintiff's only evidence to support the falsity of this statement is his Affidavit in which he states that the comment about poor maintenance is "completely false" and he describes certain maintenance projects that he oversaw during his tenure as General Manager.  Doc. 46 at 268. This evidence is merely plaintiff's opinion about the condition of the course.  It does not prove Mr. Garrity's statement false because his opinion about poor maintenance is "not capable of being shown true or false."  *El-Ghori*, 23 F. Supp. 2d at 1269.  Also, Mr. Garrity disclosed the facts that, he believed, supported his opinion.  And, the unconverted summary judgment facts show that the information that Mr. Garrity relied on to form his opinion "are substantially true." *Ruebke*, 738 P.2d at 1250.  Plaintiff thus cannot support a defamation claim with Mr. Garrity's opinion about the golf course's condition.

Plaintiff also contends that the article's statements about new renovations at the clubhouse, the pool being covered with a tarp, and the closed picnic area, are defamatory.  All of the statements refer to the conditions of the club when the article was published, after plaintiff's

employment had ended.  None of the statements refer to plaintiff.  And, plaintiff concedes, none disgrace him.  Doc. 47 at 45.

### ix.    Mr. Francis' Attempts to Save Hillcrest

The article states that Mr. Francis, "time has proved, wanted to save Hillcrest, not annihilate it."  Doc. 32-1 at 3.  This paragraph of the article goes on to describe Mr. Francis' efforts to "put Hillcrest back on its feet."  *Id.*  None of the statements refer to plaintiff—they refer to Mr. Francis.  No reasonable jury could conclude that these statements are defamatory of plaintiff.

### x.    Vlad the Impaler

The article's use of the term, Vlad the Impaler, is not defamatory.  Instead, it is mere hyperbole.  *See Rinsley*, 700 F.2d at 1309 (affirming summary judgment because the alleged defamatory statements were "rhetorical hyperbole" and "exaggerated expressions of criticism").  Such statements cannot support a defamation claim.  *Id.*; *see also Gatlin v. Hartley, Nicholson, Hartley & Arnett, P.A.*, 26 P.3d 1284, 1287 (Kan. Ct. App. 2001) (affirming dismissal of defamation claim that "constitute[d] personal opinion and hyperbole, not defamation").

Considering the context and surrounding circumstances, no reader of the article would believe that plaintiff committed acts similar to the atrocities committed by the 15th century's Vlad.  Instead, the article conveys Mr. Garrity's opinion of plaintiff's management style as one that was harsh and unkind.  Mr. Garrity explained that he used the Vlad pseudonym because he believed it "aptly described in a rhetorical sense" plaintiff's management style "which resulted in him 'killing off' the membership."  Doc. 34-1 at 18.  This exaggerated description of plaintiff's management style is not defamation under Kansas law.

In sum, after considering each of the article's alleged defamatory statements as well as the article's contents as a whole, no reasonable jury could conclude that any of the statements are both false and defamatory as a matter of law.  The court thus grants summary judgment against plaintiff's defamation claim for this second, independent reason.

## 2. Intentional Infliction of Emotional Distress Claim

Defendants next assert that plaintiff's claim for intentional infliction of emotional distress fails as a matter of law.  "Kansas has set a very high standard for the common law tort of intentional infliction of emotional distress or, as it is sometimes referred to, the tort of outrage." *P.S. ex rel. Nelson v. The Farm, Inc.*, 658 F. Supp. 2d 1281, 1304 (D. Kan. 2009) (citation and internal quotation marks omitted); *see also McCall v. Bd. of Comm'rs of Cty. of Shawnee, Kan.*, 291 F. Supp. 2d 1216, 1229 (D. Kan. 2003) ("Claims of outrage in Kansas are reserved for the most egregious circumstances.").  Indeed, "[t]he overwhelming majority of Kansas cases have held in favor of defendants on the outrage issue, finding that the alleged conduct was insufficiently 'outrageous' to support the cause of action."  *Lindemuth*, 864 P.2d at 749.

In Kansas, intentional infliction of emotional distress requires the following four elements:

> (1) The conduct of the defendant was intentional or in reckless disregard of the plaintiff; (2) the conduct was extreme and outrageous; (3) there was a causal connection between the defendant's conduct and the plaintiff's mental distress; and (4) the plaintiff's mental distress was extreme and severe.

*Valadez v. Emmis Commc'ns*, 229 P.3d 389, 394  (Kan. 2010) (citing *Taiwo v. Vu*, 822 P.2d 1024, 1029 (Kan. 1991)).  Defendants assert that the summary judgment evidence fails to present a triable issue on either the second or fourth elements because no reasonable jury could conclude

either that:  (1) defendants' conduct was extreme and outrageous, or (2) plaintiff sustained

extreme and severe mental distress.  The court agrees.

### a.   Extreme and Outrageous Conduct

The Kansas Supreme Court has defined the type of extreme and outrageous conduct

necessary to support an intentional infliction of emotional distress claim.  It "must transcend a

certain amount of criticism, rough language, and occasional acts and words that are inconsiderate

and unkind."  *Valdez*, 229 P.3d at 394.  "The law will not intervene where someone's feelings

merely are hurt."  *Id.*  Instead, the claim requires conduct "outrageous to the point that it goes

beyond the bounds of decency and is utterly intolerable in a civilized society."  *Id.* (citing *Taiwo*,

822 P.2d at 1029–30).

Here, no reasonable jury could conclude from the summary judgment facts that

defendants' conduct was extreme and outrageous.  Plaintiff asserts that "lying in an international

publication" constitutes an extreme and outrageous act sufficient to support an intentional

infliction of emotional distress claim under Kansas law.  Doc. 46 at 36.  This statement is not

consistent with Kansas case law.  The state's Court repeatedly has affirmed summary judgment

against outrage claims in cases involving significantly more compelling facts than the ones

presented here because the conduct was not extreme and outrageous.  *See*, *e.g.*, *Burgess v.*

*Perdue*, 721 P.2d 239, 243 (Kan. 1986) (affirming summary judgment against an outrage claim

brought by a mother who was told that her son's brain was in a jar); *Hoard v. Shawnee Mission*

*Med. Ctr.*, 662 P.2d 1214, 1225–26 (Kan. 1983) (holding that a defendant hospital's conduct was

not extreme and outrageous when it erroneously informed plaintiffs that their daughter was

dead); *Roberts v. Saylor*, 637 P.2d 1175, 1180–81 (Kan. 1981) (affirming summary judgment

against an outrage claim brought by a patient against a doctor who approached the patient, as she

was on a gurney at the hospital preparing for surgery, and told her that he did not like her).

The facts here simply cannot rise to the level of extreme and outrageous conduct

necessary to support a triable claim for an intentional infliction of emotional distress under

Kansas law.  Viewing the summary judgment facts in the light most favorable to plaintiff, no

reasonable jury could find that defendants' statements—ones made in an article that does not

even mention plaintiff by name—transcend the bounds of decency or are utterly intolerable in a

civilized society.  The court thus grants summary judgment against plaintiff's intentional

infliction of emotional distress claim for this reason.

### b.  Extreme and Severe Mental Distress

The court also grants summary judgment against plaintiff's intentional infliction of

emotional distress claim for a second, independent reason.  The summary judgment record fails

to present facts for a jury to conclude that plaintiff sustained extreme and severe mental distress.

This element requires emotional distress that "is sufficiently severe, genuine and extreme that no

reasonable person should be expected to endure it."  *Roberts*, 637 P.2d at 1179.  Although

"[e]motional distress passes under various names such as mental suffering, mental anguish,

nervous shock, and includes all highly unpleasant mental reactions, such as fright, horror, grief,

shame, embarrassment, anger, chagrin, disappointment, and worry," "it is only when emotional

distress is extreme that possible liability arises."  *Id.* at 1180.  "The extreme distress required

must be reasonable and justified under the circumstances, and there can be no liability where the

plaintiff has appeared to suffer exaggerated and unreasonable emotional distress, unless it results

from a peculiar susceptibility to such distress of which the actor had knowledge."  *Id.* (citations

omitted).  "The emotional distress must in fact exist, and it must be severe."  *Id.* (citation
omitted).

Plaintiff asserts that the article has caused him anxiety, diarrhea, sleeplessness, and
shaking.  Plaintiff contends that he has sought medical treatment for these symptoms, but he
adduced no records consistent with his position that he received medical or psychological care
because of the article's content.  Plaintiff also states that he has taken prescription drugs for his
anxiety, but he did not start taking the drugs until almost two years after the article's publication.
Plaintiff's description of his symptoms, alone, is insufficient to establish the type of extreme and
severe mental distress necessary to support an outrage claim under Kansas law.  *See*, *e.g.*,
*Valadez*, 229 P.3d at 395 (holding no extreme and severe mental distress existed, although
plaintiff felt physical ill, afraid, and cried, because the record did not show long-lasting effects or
that plaintiff sought medical treatment or psychological counseling specifically related to the
alleged outrageous conduct); *Roberts*, 637 P.2d at 1181 (affirming summary judgment and
concluding no extreme and severe distress when plaintiff expressed fright, embarrassment and
worry because "[t]he emotional distress suffered by her was resentment and upset which
normally results from acts and criticism which are inconsiderate and unkind" but does not
constitute an actionable outrage claim); *Dana v. Heartland Mgmt. Co., Inc.*, 301 P.3d 772, 781
(Kan. Ct. App. 2013) (affirming summary judgment and holding that plaintiff's allegations of
chest pain, discomfort, and crying and that he had to increase his heart and sleep medications did
not rise to the level of extreme or severe distress).

The summary judgment record also lacks evidence from which a jury could infer that the
statements in the article caused plaintiff's anxiety.  Plaintiff concedes that he suffered from
anxiety before the article's publication.  He testified that he previously took medication for

44

anxiety in 2011, when he was fired from Hillcrest Country Club and David Francis had called the police on him.  Plaintiff claims that he experienced anxiety again because of the article.  Yet, plaintiff did not begin taking medication for this condition until more than two years after the article's publication.  No reasonable jury could infer causation from these facts.

The court thus concludes that the summary judgment record fails to present a triable issue whether plaintiff sustained severe and extreme emotional distress because of the statements made in the GOLF.com article.  The court thus grants summary judgment against plaintiff's outrage claim for this second, independent reason.

## IV. Conclusion

As noted at the outset, the game of golf regularly inspires colorful hyperbole.  But hyperbole rarely provides the legal requisites for defamation claims.  It is even less likely to supply the foundation for a legally actionable claim for inflicting emotional distress.  And so it is here.  The court thus grants defendants' summary judgment motions because no genuine issues of material fact exist for a jury to decide.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Heartland Golf's Motion for Summary Judgment (Doc. 31) and defendant Time Inc.'s Motion for Summary Judgment (Doc. 33) are granted.

**IT IS FURTHER ORDERED THAT** defendant Heartland Golf's Motion to Strike (Doc. 50) and defendant Time Inc.'s Motions to Strike (Docs. 52, 53) are granted in part and denied in part.

**IT IS FURTHER ORDERED THAT** plaintiff's Motion to Strike defendant Heartland Golf's Motion for Summary Judgment, Memorandum in Support, and Reply (Doc. 58) and

plaintiff's Motion to Strike defendant Time Inc.'s Motion for Summary Judgment, Memorandum in Support, and Reply (Doc. 59) are denied.

**IT IS SO ORDERED.**

**Dated this 16th day of March, 2017, at Topeka, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**